The first case today is 151170, Imre Tsarnaev. Counsel. Good morning, Your Honors. May I reserve five minutes for rebuttal? Yes, you may. Thank you. We realize that mandamus is an extraordinary remedy that requires a clear entitlement to relief and irreparable harm, but we also believe that this is an extraordinary case stemming from bombings and an iconic event, the 213 Boston Marathon, and their aftermath that affected at least the entire Eastern Division. People in the Eastern Division were connected to the events in many ways, and potential jurors shared in these associations, contacts, allegiances, affiliations, expressions of solidarity. Three were killed. Many were injured. There was a shelter-in-place lockdown in seven communities, suspension of public transit during the search for the perpetrator. This attack was viewed as an attack on the marathon itself, an event to which many people have connections, and an attack on the city of Boston, which is illustrated by the widespread Boston Strong reaction that began shortly after and continues to this day. We saw outside the courthouse in one of the construction sites cement mixers that expressed these sentiments, and pictures of those are appended to our most recent submission, along with a Boston Strong flag that was in a building across from this courthouse at an earlier point in time. This case involves saturation publicity, too, publicity with emotional as well as factual impact. Ms. Meisner, I'm sorry to interrupt you, but there is a preliminary question. The government has raised an issue about whether mandamus relief is available at all here, and it cites us to a Sixth Circuit case, several cases. Apparently that circuit has adopted as a matter of law the rule that an interlocutory appeal in the courts of appeals to review a trial judge's response to a change of venue motion. And we do not think that this court's never resolved the question about that. In Ecker, which was a case involving the transfer from an individual back and forth between Massachusetts and Minnesota, in a footnote in one of the Ecker cases, this court suggested that the government should have sought mandamus if it had an objection to one of the transfers. And I think mandamus relief is required here for the same reason that it was required in Bulger. Justice has to have the appearance of justice, and there's a need to secure public confidence through proceedings that And this goes to the irreparable injury component of mandamus, because with the availability of review of a change of venue question later, that is to say if venue is not changed now, if there is a trial, and if there is a conviction, then an appeal will be taken, and during that appeal one of the issues can be that venue should have been changed, that a fair trial was not obtained. So it's a little difficult to see what the irreparable injury is to the petitioner, or so the government argues. Yes, but in Bulger this court also said we don't have to even look at whether there was irreparable harm to the defendant in that case. We're going to look at what was the harm to the judicial system. All right, so you're relying not on harm to the petitioner, but on harm to, as you argue it, public perception of the judicial system. Is that correct? That is correct. Primarily there are some impacts from delayed review in terms of potential exposure, potential additional publicity and exposure, but the main reason for reviewing it at this point in time would be the public confidence in the judicial system and the public perception. In terms of whether mandamus is appropriate, we cited in the first mandamus petition beginning on page 17 a number of cases in which courts have held that the denial or granting of a motion to transfer a criminal or civil case may be challenged by mandamus. So while the government has cited cases to the contrary, it's not a one-sided question. Can I ask you one more question about the standard of review? You've acknowledged that there has to be a clear entitlement to relief, and we look at whether there is irreparable harm. The government says here there's sort of a two-level layer of relief review having to do with abuse of discretion because the request was under 21A. I can't find in your papers whether you think that's accurate, inaccurate. Do you have a position on that? Well, I agree that this court has said that the denial of motions for change of venue are reviewed for abuse of discretion. But when there is a clear abuse of discretion, as we maintain there is here, I suggest that that rises to the level of clear entitlement to relief, that where it is clear that the district court has abused its discretion, then we are entitled to relief because this is not venue is not a routine trial management issue like setting the hours of the trial or when a jury is going to go out for lunch. These are the change of venue in this case is at the heart of the Sixth Amendment. The Sixth Amendment requires trial by an impartial jury, and that's a right that's chiseled in this building on the wall in Courthouse Way. So it's not a routine, mundane trial management issue. Good morning, Ms. Misner. Good morning, Judge Tawaiya. How many jurors have been preliminarily qualified to date? The number of provisionally qualified jurors is 59, I believe, 61 as of yesterday. This is after Waudeer? Yes, this is after Waudeer, but they've been provisionally qualified. And the government has said that we're not challenging whether the provisionally cleared jurors are fair and impartial, and that's not accurate. There has been a challenge to any provisionally qualified juror, and in addition to – Is that based on your allegation that there's a presumption of prejudice? Yes, that the venue should have been – change of venue should have been granted and there's a presumption of prejudice. Why isn't Waudeer a sufficient process for determining their prejudice? Because, as this court said in Orlando Figueroa, that prejudice may be presumed where inflammatory publicity has so saturated a community it's too difficult to draw an impartial jury or other jurors admit to prejudice to cause concern as to any avowals of impartiality by other jurors. And long ago, in Delaney, this court recognized the same difficulty, that you can't necessarily take the avowals of people under Waudeer, even though they may be acting in the utmost of good faith. When you're talking about the kind of saturation that has occurred here and the six degrees of connections that have been expressed both in the questionnaires that this court has access to and in the Waudeer, that a juror may not know at this point in time what is going to impact that person when trial evidence actually starts and whether that is going to affect their partiality or impartiality. I'm sorry, as I understand the government's ultimate argument, or at least one of the ultimate arguments, they allege that the time to review this is after all the Waudeer has taken place, after the jury has been picked, and after the trial takes place. What do you say to that? Well, we say that that is not the appropriate time because reviewing the Waudeer is not necessarily going to give you the assurance that these jurors are going to be impartial. In the supplement, I believe, to the, in this case, there is a reference to the district court's analysis that is under seal, but is in the sealed brief, and I would have one moment. I will find the page for you. I think that that is a good explanation of why waiting is not appropriate and why reviewing the Waudeer will not get at whether people  and have formed opinions of guilt will be able to accurately determine whether in the middle of the trial something has affected them that they didn't think would affect them because of these prior associations. Well, I will submit that. We've read your materials. Well, the, and I think that is a good explanation of the difficulty of addressing the potential prejudice where it has been so expansive and so pervasive. The publicity in this case has not simply been factual reports. The, you know, one example of kind of the emotional connection might be the picture of the man shoveling off the finish line at the marathon recently, shoveling off the snow, and it was all over Twitter, and the Boston Athletic Association. Sorry, that leads me to interrupt you again and ask you a question. Have these incidents, including, for example, the issue about the Paris incident, all these things that have happened in recent times, have these been the subject of Waudeer? The, not specifically. There has been, it's been sporadic and erratic. There has been some questioning as to whether jurors had seen publicity, anything about events in Europe, and some people said they had, others had not. But it was not focused or consistent. And the jury has been instructed, the potential jurors have been instructed not to watch any publicity or watch any news. I'm sorry, I don't understand the not consistent. Don't you have the opportunity to ask whether they are aware of recent events in France or Europe? And if you chose not to ask. Questioning has been cut off in terms of content. That's a different question, isn't it? You were allowed to ask questions in general about, at a more general level,  I'm just trying to follow on with Judge Torreya's question. Well, some have said that they were. No, but you've had the opportunity to ask that question of all the jurors. The court has been asking that question. Yeah, okay. But the court has been also cutting off efforts to get at what has been called the skilling question. What is the content of what you have been exposed to? Which makes it somewhat difficult to get a good handle on whether someone has been exposed to something that will present them with bias. Was that question that you're now referring to a matter of negotiation before the jury questionnaires went out? No, because the Charlie Hebdo events occurred after the questionnaire. Now, the government has also referred to the questionnaires as being. I'm sorry, I thought the skilling question. Yes, oh, the skilling question. I thought we were referring. Yes. Sorry. There was, again, this was a discussion of the questionnaires in a sealed chambers proceeding. But there were questions that were agreed to that the court rejected. Answer the question. There were questions that the defense requested that were kept out upon government objection and questions that were included at the government's request over the defense objection. So it was not an agreed to questionnaire. And that skilling question was not included by the court in the questionnaire. Over your objection? Yes. In the questionnaire? Yes. Thank you. Good morning. May it please the court, Logan Weinreb for the United States. I regret I'm unable to stand throughout the oral argument. You have the court's permission to remain seated. Thank you, Your Honor. More than one member of the court has back problems. I appreciate that. Your Honors, this is not an appropriate case for mandamus. Mandamus is reserved for cases in which a district court judge has acted entirely outside of his authority or has refused to carry out a duty that the law commands him to carry out. That is not the situation in this case. The district court judge in this case has written three very thoughtful opinions explaining his reasons for his discretionary decision not to transfer Venue to another district. In those opinions, he's made it clear that he has reviewed all of the evidence in the quite voluminous record that the defense has prepared below, that he has read all the pertinent cases, that he understands the law, and that he's made a reasoned decision based on the facts and the law. Under those circumstances, there's simply no grounds for a petition for mandamus. Good morning. Good morning, sir. Are there any set of facts that you would add to this scenario that would make this case appropriate for the relief that is being requested by the defendant in this case? If you're asking whether there are any set of facts that would make it subject to mandamus review, I would say the only thing that would make it subject to mandamus review would be evidence that the district court judge had abdicated his responsibility to exercise his discretion in this case. And even then, that would presuppose that a Venue decision could ever be reviewed on mandamus, which is something this court has never decided and need not decide in this case. If you're asking about the merits of the decision and whether there's anything on the merits that would make this an appropriate case for a change of Venue, I think that the answer can be found in the Supreme Court's cases, in particular the three that were decided back in the 1960s and in Skilling. We'll go into that in a few minutes. What if the district court was refusing to accept that there is a presumption of prejudice based on the facts? Well, the district court in this case considered the possibility. Can you just answer my question first and then I'll let you explain it? If that were established, that there is a presumption of prejudice based on the facts in this case, would that be sufficient in your view to allow mandamus? The Supreme Court has held that, at least in Skilling, it examined whether there was a presumption of prejudice and did not abandon that doctrine in that case. Therefore, I would agree that if the district court had found that there was a presumption of prejudice, that he would necessarily be seating biased jurors, regardless of how thorough and careful the questionnaire and voir dire process had become, and yet he refused to transfer the case for some reason wholly outside of what's authorized by the law, that that might be an appropriate case for mandamus, assuming that the defense could show irreparable harm. That's a separate question, and I don't believe that the defense has showed that or can show that in this case. What percentage of prospective jurors need to have an opinion regarding Defendant's Guild before hearing any evidence at trial to have a presumption of prejudice arise in your view? Your Honor, over 100 years ago in the Reynolds case, the Supreme Court wrote that when a sensational crime occurs, virtually every member of the community who is well-suited to be a juror will necessarily have heard about the case and will have an opinion about the defendant's guilt or innocence. For that reason, the Supreme Court has never established a numeric threshold beyond which prejudice must be presumed. Yes, but I'm asking you and wondering if you have any opinion. Well, Your Honor, in the Patton v. Yount case, which is the Court's latest opinion to deal with this issue squarely, far more jurors than in this case expressed a prejudgment about the defendant's guilt, and yet the Supreme Court held that that factor was not an important factor in light of others, that it had identified in that case and in others as being more important to the venue analysis. So, for example, the amount of time that elapsed between the time of the events in the trial, the nature of the publicity, and most importantly, in Skilling, the Court identified the size of the jury pool as being among the most important. I appreciate your long answer, but the question is, do you have any figure in mind? Your Honor, I don't think that it makes sense to come up with a numeric threshold. I'll make it easy for you. Would you say if 100% of the jurors came up with that kind of prejudice, would you say that is enough to arise a presumption of prejudice? I believe that under the law it's a factor in the venue calculus. In that case where 100% of jurors believed the defendant was guilty and one could be confident that that would not be true in other jurisdictions, that would be a weighty factor. What about 95%? Again, the same answer, Your Honor. I think, though, that in this case, as I understand the allegations of the defendant in this case, assuming they're correct, there is a 95% group that stated that, in other words, the answer is that only 5% of the answers to the jury question is that they did not have a formed opinion. I believe that 95% did have a formed opinion as to the guilt of the defendant. I don't believe that's correct, Your Honor. Well, you don't believe that's correct because you don't agree with the allegations of the defendant, or is there another reason? I don't believe that correctly states the allegations of the defendant. I believe what the defendant alleged was that a public opinion poll that his expert conducted in advance of trial showed that 95% of individuals in this district, and for that matter in virtually every district polled, had a prejudgment of the defendant's guilt. I think what the defense has alleged is that 67% or close to 70% of those who completed questionnaires in this case said that they had a prejudgment of the defendant's guilt. That is a lower percentage than, for example, in Patton v. Yount, where the Supreme Court held that that number of jurors had carried their opinion into the jury box, and yet that alone was insufficient to give rise to a presumption of prejudice in light of other factors that the court deemed more important. As I understand it, in response, I'm talking about the questionnaires now. In response to the questions, have you formed an opinion that Zharnov is guilty? Just 5% replied no, which means that 95, my mathematics may be off, but I believe the balance would be 95%. Donner, if the court looks at that question, which is in our appendix, you'll see that the question asks, have you formed an opinion that Zharnov is guilty? Have you formed an opinion that Zharnov is not guilty? And then it goes on. And there are three options for answering, yes, no, and unsure. And the 70% figure relates to the numbers who say yes. I believe the defense may be counting those who say unsure. Their premise is that someone who says they are unsure has developed some belief that he is guilty, just by a lower probability. But we do not believe that's a fair inference as to what the meaning of that answer is. And, in fact, jurors below, if the court looks at the voir dire, have said unsure means they are unsure because they simply don't have enough facts to form an opinion. Well, in fact, doesn't the petitioner say in his briefing that the figure 5% are those who had formed an opinion that the defendant was not guilty? That's correct. And then the others, there's a breakdown. The others are either forming an opinion yes or unsure. Whatever they said is in writing, so we won't quibble at this time. But let's go into the voir dire issue. My impression is that one is more likely to get truthful answers from prospective jurors from their written answers to the questionnaires rather than through voir dire, where there are a substantial number of questions are leading and where they may very well feel intimidated by the very nature of being questioned individually. Why is that the wrong impression? I don't believe that that is either the experience of district court judges, as they have described it in their own opinions about voir dire, or the view that is reflected in decisions of the Supreme Court or this court, which have emphasized the importance of a judge's ability to question a juror face-to-face, evaluate the juror's affect, body language, hesitations, ability to understand questions, the ability to probe whether the juror in answering the question was expressing a strong opinion or one easily set aside. Questionnaires are a very blunt instrument. They're only a basis for obtaining information that might be sufficient to excuse a juror on grounds of hardship or as a starting point for further questioning to really get to the heart of what the juror is saying. So you don't accept 95%? Well, let's see what you do accept. Did 68% of prospective jurors indicate that he was guilty? Your Honor, that's an allegation in the defendant's brief. We have not independently gone through each. Well, let's assume it's true. Let's not argue about one way. Assuming it's true, would that be sufficient to establish prejudice? No. What about what the Supreme Court said in doubt? Where so many, so many times admitted prejudice, such a statement of impartiality by prospective jurors doing voir dire can be given little weight. Your Honor, this case is very different from Dowd in many respects, but I think the most important thing is that Dowd was decided in 1964. Patton v. Yount was decided in 1984, 20 years later. They had less media through electronics, therefore less diffusion of information. I think it's also at a time, if you, in the Patton v. Yount opinion, the Supreme Court refers to Ervin as a leading case during its time, and I do agree that there was, the media environment was very different then, but I draw a different inference from that. That case, along with the other triumvirate of venue cases decided by the Supreme Court, Shepard, Estes, and Rideau, were all decided at the dawn of the media age when widespread publicity through television and radio blanketing a small community was a new thing. By 1984, you already had national newspapers, national news channels, and the fact that a sensational case was going to receive nationwide publicity had already become a commonplace, and I believe that the court at that point looked back to its earlier opinions, looking at, starting from first principles, about what importance it has if a juror has been exposed to pretrial publicity and concluded, as it has many times over the past hundred years, that exposure to pretrial publicity alone does not disqualify a juror, that having formed an opinion about a defendant's guilt based on that pretrial publicity does not disqualify a juror, because the court has expressed confidence that jurors are able to separate what they have heard and opinions they've formed based on incomplete information seen in the press, and their duty as a juror to decide cases purely on the evidence presented in the courtroom, a solemn duty they swear to uphold, and that I believe it's the experience of district court judges, as Judge O'Toole has stated in his opinions below, is one that he believes they follow. My summary research has turned out that in the last five years, there have been 463 criminal jury cases tried in the entire circuit, 188 in Massachusetts. Can you provide me with a single example of a criminal case in this district or in this circuit where the answers to the jury questionnaires have had expressions against the defendant that were as prejudicial to the defendant as those expressed by multiple jurors in this case, and I'll just provide you with a few, and all of these have been made public. Quote, why waste time on this guy, you know he's guilty, end quote. If I get picked, I know how I'm voting, guilty, end quote. Quote, what a waste of time and money, end quote. Quote, we should skip the trial and go right to sentencing because of the assumed guilt of the heinous crimes that he is accused of, end quote. Quote, with this case, I think a public execution would be appropriate, preferably by a bomb at the finish line of the marathon, end quote. Your Honor, I cannot cite another case. However, I would suggest that quotes that are drawn in that manner, which the district court below found were selective and misleading because they purport to characterize what the answers to the questionnaires were as a whole and do not fairly do so, are not a basis on which to make a decision. Moreover, the, but then we have the problem with the case we decided in 1980, O'Brien, of Brian, not O'Brien, Brian, which we said, in some circumstances, publicity concerning a case may be so extensive and intense that no inquiry need be made as to the actual effect of the publicity on the petit jury. Prejudice is presumed. It need not be established. Seems to me that where you have, I may be wrong, that the court, the Supreme Court has in its, in the past 50 years, in its entire history found only one case that matched that description. That was Rideau versus Louisiana. Was it even close to the facts in this case? Yes, Your Honor. That was a case in which the defendant was interviewed, was televised live in the jailhouse confessing to the crime, and that was broadcast to a tiny community over and over in the days immediately leading up to the trial, so that the Supreme Court found that his trial had essentially already taken place in that jailhouse and that any proceeding would be a kangaroo court proceeding. Well, is it this case similar at least in terms of that the defendant was televised allegedly, placing a package at the place where the bomb took place, and the media immediately thereafter published this all over the television locally and nationally for that matter? Your Honor, that video was broadcast and will, by the time the trial takes place, will have been broadcast nearly two years earlier. It was not broadcast to a population, a small population of a little Louisiana parish, but to a district with five million residents, many of whom have told us during voir dire that they don't watch television, they don't pay much attention to the news, they lead busy lives, or that they understand that what you see in the media is only one little piece of what happens. There's no comparison between a video like that and a televised confession. That leads us back to Delaney, in which, quoting Justice Jackson, we said, the naive assumption that prejudicial effects can be overcome by instructions to a jury, all practicing lawyers know to be a mitigated fiction. Your Honor, Delaney is a case from the 1950s. This Court has over and over again since then expressed the exact opposite view, and one that has appeared in many Supreme Court opinions, that jurors are presumed to follow their instructions, presumed to follow the law, that they take their oaths seriously. One of the oaths they've repeatedly taken in this case is an oath to tell the truth about their exposure to pretrial publicity, about their prejudices to the extent they have any. And I believe the quotes that the Court read earlier actually confirm that that is taking place in the Court below, that people who have strong opinions about this case are unhesitatingly admitting them, and if they feel that they can't set them aside, even though they understand that that is what is required of them as a juror if they were to sit in this case, they have unhesitatingly admitted that they can't set them aside. The voir dire process is working. Well, at what date do we discount what the Supreme Court has said before that? Your Honor, I'm not asking or suggesting that the Court should discount it, but merely that all those opinions need to be read as a whole, it's a body of law, and that Irvin v. Dowd was discussed in Patent v. Yount and was distinguished by it. It was also discussed and distinguished by the Skilling case. I think it is a basic principle of statutory construction, or I shouldn't say statutory construction, but of the understanding of cases that more recent ones supersede earlier ones. Thank you very much for answering my questions. Thank you, Your Honor. Five minutes of rebuttal. First, I'd like to say it's not only the prejudicial pretrial publicity, although there is a saturation level of that, but it's that coupled with the connections and the allegiances that people feel to the marathon that makes this case different from a case like Skilling or like Yount and makes it a case like McVeigh. In Skilling, when the, yes, the size of the community is similar, but in a survey, when people were asked to name Enron executives who were guilty of crime, 12.3% named him, 43% said they didn't know his name or nothing came to mind when they were asked what words came to mind when you hear the name Jeff Skilling. That's not the same kind of response you get to the name Sarayev. The publicity the court characterized as not kind, but there was no confession or other blatantly prejudicial information. Like we've said out in the papers, both in district court and here. Is there a confession here? There are news reports characterizing admissions, characterizing defendant's statements as admissions. That's not a confession. No, it's not a confession, but I'm suggesting. What's your next point? Excuse me? What's your next point? That the court in Skilling also said that during the four years between the Enron bankruptcy and the trial, the decibel level of the media attention diminished somewhat here. We have had a continual influx of publicity. Appropriately, of course, that's because the matter was set for trial and there are all of these motions and if you're covering the news, of course, you're going to cover that. So wouldn't that be true anywhere in the country that this trial was set? This trial has not. The publicity that has been in the local news, the stories about the victims' struggles to recover, is not something that is in the nationwide news. It's that salient, what Judge Mage called salience in McVeigh, that there is a connection between the people in this city and in this division and the events that occurred and the ongoing efforts of people to recover from that that you just don't have in another community. You're not going to have people in Washington who say, oh, my best friend was standing near the finish line or my wife was a nurse and treated patients in the ICU. You just don't get that kind of involvement and affect in other jurisdictions. And it's that connection and that allegiance, the Boston Strong Cement Trucks, that you're not going to see in another jurisdiction. That people won't have the same, they won't come to it with the same set of emotions and feelings in another jurisdiction that they have. And there's nothing wrong with that. It just means that it is not an appropriate place to try this case. In Yount, you had a case that the extensive publicity was before the first trial in 1966 and it was 1970 retrial that the court was addressing a change of venue motion, addressing the merits of the change of venue in that case. And we don't have that same kind of passage of time and we don't have only publicity about the crime, which is what they had there, but we've got, as I said, the kind of view of these events as an assault on the city and the marathon. And that takes this out of the realm of even cases like Bulger, where you're talking about certainly a widely publicized, but a crime that was not directed at an entire city or an event. Ms. Meisner, before we close, in your petition for initial en banc with respect to this hearing, you said that there is an important issue in this case involving whether, if there is a presumption of prejudice based on pretrial publicity, it is rebuttable or not. But you don't argue that anywhere in your papers to us. Is that issue in this case at this point or not? Well, to the extent that the court wishes to, it has not been met head on. It's simply noted as an open question. But I would note that in- What is your position? My position is that it cannot be rebutted for the reasons that we set out in some of our earlier papers. And I would just finally note that in Gonzales-Lopez, which was- And if that's true, then the voir dire answers are largely irrelevant. Do not cure the problem. That's your position. Yes. You know what? Isn't that what the Supreme Court said in the Louisiana case? The presumption is established. You don't go into the- It's an open question. But Gonzales-Lopez also notes that where there's been exposure to prejudicial publicity, this is during trial, we've required reversal because the effect cannot be ascertained. And we believe that's the same here. Thank you very much. Thank you.